SICCHIO and another, Appellants, v. ALVEY and others, Respondents.*

*May 3—June 7, 1960.*

* Motion for rehearing denied, without costs, on October 4, 1960.

530

For the appellants there was a brief by *O'Melia & Kaye* of Rhinelander, and oral argument by *Walter F. Kaye*.

For the respondents there was a brief by *Everis H. Reid* of Hurley, attorney, and *Wright & Zinn* of Ironwood, Michigan, of counsel, and oral argument by *Mr. Ivan D. Wright* and *Mr. Reid*.

FAIRCHILD, J. 1. *The "unplatted alley" claim.* The complaint alleged that an improved driveway, 20 feet wide, extended north and south across all five lots. No witness, however, testified to the existence at any time of a driveway which completely fulfilled that description. A number of witnesses did testify that they, or others, had driven back of these buildings for various purposes; some that there were more or less defined tracks, and some placed the date as early as 1906. Plaintiffs' brief asserts that, "The wholly uncontradicted evidence is that since prior to 1910, the public

and businessmen used an unplatted alley across the rear of lots 1–5." The circuit court and we do not find it so.

The circuit court was convinced that there could have been no driveway across all the lots before 1939 because of the existence of physical obstructions. These were the Northern Hotel building on lot 1, and the fence which inclosed the basement of this building after it burned, and until 1927, a fence which ran from the rear of Shea's tavern located on the south half of lot 3 to the east lotline. Two maps as of 1922 and 1929 were admitted in evidence by stipulation. It was agreed that the maps show generally the location of buildings, but plaintiffs did not concede that they were accurate as to "dimensions of the buildings and the accuracy of their placement as far as the lotlines are concerned." Both maps indicate that the hotel building extended to the east line of lot 1. Several photographs were in evidence. These were pictures of Mr. Shea and his dogs, and were taken in the back yard south of the fence referred to. Witnesses identified the buildings in the background, and the hotel building appears to have extended much farther east than the buildings on the other lots. There was testimony that Shea's building burned in 1925 or 1926, but there was also testimony that the conditions shown in the picture existed in 1927. It is perfectly clear from the pictures and the testimony that there was no driveway crossing lots 1, 2, 3, and 4 when the pictures were taken, and the maps, although not qualified as accurate for all purposes, the photographs, and the testimony when taken together support the court's finding that the hotel building extended to the east line of lot 1, or at least close enough to prevent passage across lot 1 by vehicle.

Perhaps those who drove back of these buildings in the early years followed a route partially, or wholly across the unnumbered portion of block 1 to the east of the five lots. The record unfortunately does not disclose the character of

that land, nor the improvements upon it. It does appear that since 1943 or 1944, plaintiffs have owned the part of the unnumbered portion which lies just east of lots 2, 3, 4, and 5.

2. *Plaintiffs' claim of easement by prescription as owners of the north half of lot 3.* There was no evidence locating the ·claimed driveway by measurement with respect to lotlines, or improvements. Two recent photographs taken at the rear of defendants' hardware store, looking south, show the way which has been used for some time by vehicles, and which ·defendants obstructed prior to the commencement of this action. We can see that it is dirt or gravel, shows wheel marks, and passes immediately east of defendants' building, immediately west of a building to the south, which we can guess is on the rear of lot 4, and apparently reaches Highway 51 by passing east of a building on lot 5. Defendants obstructed this passage in 1956. Plaintiffs first acquired the north half of lot 3 in 1938. From 1926 to 1938 both properties, the north half of lot 3 and the south half of lot 3, and the north 20 feet of lot 4, were owned by Rugee. Any actual use he made of a driveway across the south half of lot 3 and the north 20 feet of lot 4 in connection with his use of the north half of lot 3 was as owner of both tracts. No easement could arise therefrom, and the period of prescription could not commence to run until plaintiffs acquired their title in 1938. *Miller v. Hoeschler* (1905), 126 Wis. 263, 267, 105 N. W. 790; *Tarman v. Birchbauer* (1950), 257 Wis. 1, 5, 42 N. W. (2d) 158.

3. *Plaintiffs' claim of easement by prescription as owners of part of lot 2.* Plaintiffs acquired a portion of lot 2 in 1946. Attorney Flandrena became familiar with that parcel in 1927, owned it from 1930 to 1934, and he, or his mother, ·had some interest in it until 1946. There was a barbershop located on this parcel. Donald Welch was the barber from 1923 to 1936, and Gordon Thompson from 1936 to 1938 or 1939. All three were witnesses, called by the plaintiffs.

Mr. Flandrena referred to a "private driveway that went from Lake street to the alley in the rear of the barbershop." The wood supply for the barbershop was unloaded at the rear, but he did not know which route the wagons followed to get there. He said there was "a sort of L-shaped driveway. That is you could come from No. 51 to the rear of the barbershop. Then you could come along the barbershop and come out on Lake avenue." He said: "The road in the rear of the property we owned was—oh, you could not say it was a regularly traveled piece of road. It was partially lawn, but I know that there was deep ruts in there whenever a heavy load went through." He said that the tracks were not over the width of the usual wagon trail, and that he did not remember whether the trail took a straight course from lot 2 to Highway 51, or whether it curved.

Welch testified that before 1926 Shea's fence prevented access from the south, but that after the hardware store was built on defendants' property, there was such access to the rear of the barbershop. He customarily hauled wood across these lots four times each winter, and used the passageway daily for his truck with minnow bins in it. He testified that bootleggers used the driveway "in pursuance of their illegitimate business." He considered it to be seven or eight feet wide, and a "straight shot" south from his lot to Highway 51.

Thompson, however, who occupied the shop within twenty years prior to the date defendants obstructed the driveway, testified that the man who delivered wood to the barbershop while he occupied it would back up from Lake street between the barbershop and the Northern Hotel property. He said there was a trail across the back of lots 2, 3, 4, and 5, but he would not call it a driveway, and did not use it. He said that there was an icehouse back of plaintiffs' property, and that people would use the trail when filling that icehouse, but would approach from the south, and that some used

it in making business deliveries to plaintiffs' property or to the hardware store.

Stanley Kountney, called as a witness by the plaintiffs, operated a snowplow for the town from 1927 to 1945, and up to the time of trial, he was engaged in business, performing various kinds of mechanical services. While operating the plow, he occasionally plowed snow in the back yards of these buildings so that ice could be put up in the icehouses located at the rear. In the course of his business, he occasionally crossed the area in summer. He said it was not a road. It was a yard. There was grass in places, and there was not much travel. He did the snowplowing when asked by owners of the properties, or when asked by a member of the town board, especially near election time. He said the driveway was six or seven feet wide, about the width of the snowplow, and the condition did not exist continuously from 1927 to 1945. At times there were obstructions. Sometimes it was necessary to move a fence to get in with the snowplow. He said: "I wouldn't call them driveways. . . . It was just going through back yards in back of the buildings."

The circuit judge, in his oral opinion at the close of trial, pointed out Thompson's testimony that when he occupied the barbershop, he had made no use of any right of way, and that the people who, during that period, came in from the south did not reach lot 2. Accordingly, there was a gap in the use of the trail or driveway for the benefit of lot 2 during the period from 1936 to 1938, and the circuit court correctly concluded that plaintiffs had not established an easement by prescription appurtenant to lot 2.

4. *No highway by user.* From the foregoing summaries of testimony, it will be apparent that plaintiffs failed to establish that a public way had been established by twenty years' adverse user by the public. Plaintiffs contend that the plowing performed by the town brings the driveway under sec. 80.01 (2), Stats., providing: "All highways not re-

corded which have been worked as public highways ten years or more are public highways, . . ." But there was no maintenance by the town other than the plowing of snow, and that was done sporadically at the request of the owners, and not along a fixed route.

5. *Implied easement.* The foregoing portions of this opinion deal with the issues raised by the pleadings and tried and argued before the circuit court. Plaintiffs have added a new theory upon appeal.

Rugee acquired the north half of lot 3 from Richardson in 1914. In 1926 he acquired the south half of lot 3, and the north 20 feet of lot 4 from Wilson, who had acquired it from Shea, and in 1946, Rugee conveyed it to Blaha, who conveyed it to defendants Rynes. In the deed from Shea to Wilson, and all subsequent deeds conveying the south half of lot 3 and the north 20 feet of lot 4, there is conveyed a right of way to the south (hereinafter referred to as the Shea right of way) in the following language:

"Together with the right to drive and travel across a strip of land which is the rear or east 8 ft. of lot 5 and the rear or east 8 ft. of the south 40 ft. of lot 4, all in block 1 of the recorded plat of the village of Mercer, Iron county, Wisconsin, for so long a time as there shall be no alley or other driveway by means of which the owners or occupants of the south 20 ft. of lot 3 and the north 20 ft. of lot 4, all in said block 1, may be able to drive from any public street or highway to the rear or easterly portion of said parts of lots 3 and 4. The intention is to grant this right of way only until an alleyway is provided for the property being sold, and upon such alleyway being provided the right of way herein granted shall cease."

(We refer to the northerly portion of lot 3 as the north half, and the southerly portion of lot 3 as the south half. That was the terminology used in the pleadings and on the trial, although copies of the deeds furnished us at the time

of oral argument describe the southerly portion by metes and bounds, with 30 feet along the west lotline, 100 feet along the south lotline, and only 22 feet along the east lotline. These deeds do not show when, if ever, Rugee conveyed the small triangle between that portion and the north half. We deem the discrepancy immaterial in this lawsuit.)

Plaintiffs now contend that when Rugee conveyed the north half of lot 3 to plaintiffs, this grant included by implication a right to use the Shea right of way, and necessarily a right to cross the south half of lot 3, and the north 20 feet of lot 4 in order to reach the Shea right of way.

This theory was never reflected in the pleadings, nor urged at the trial. It is quite clear from the pictures previously referred to that the passageway, obstructed by defendants before the action was begun, did not lead to the east eight feet of the south 40 feet of lot 4, and there are statements in the record indicating that a garage on the south 40 feet of lot 4 obstructs such eight-foot strip. Passing over these facts, there are two reasons why this theory cannot be successful in any event:

(1) The Shea right of way was created by deed to Wilson who did not own the north half of lot 3. The fact that Wilson later conveyed to Rugee, who owned the north half, did not give Rugee the right to use, or to grant to another the use of the Shea right of way for access to the north half.

"A grant or reservation of a right to pass upon a private way to one lot does not confer the right to pass further upon the same way to another lot. Similarly, a right of way appurtenant to a particular lot cannot be used as a mode of access to another lot to which it is not appurtenant, even though there is no resulting additional burden.

"It has been declared that a general grant of a right of way confers a right of way just to and from those lands which the grantee owns at the date of the deed." 17A Am. Jur., Easements, p. 728, sec. 119.

(2) Even assuming that Rugee had the right to grant plaintiffs the use of the Shea right of way, he did not grant it, and the right to cross the south half of lot 3 and the north 20 feet of lot 4, unless a grant of right of way be implied in the deed from Rugee to plaintiff in 1938. Such implication would only be recognized if the claimed right of way were one of necessity. *Bullis v. Schmidt* (1958), 5 Wis. (2d) 457, 93 N. W. (2d) 476. Plaintiffs have access to Lakeview avenue at the front. Rugee apparently operated a store on the north half of lot 3, and plaintiffs operate a tavern and restaurant. Mr. Sicchio testified that deliverymen, some of his customers, and his employees used the rear entrance, and that he cannot sell his property for lack of a rear entry. There was testimony that before 1938 people crossed the rear of lots 3, 4, and 5 to fill Rugee's icehouse, and for other business purposes. We do not consider that a right of way by necessity has been established. See *Fischer v. Laack* (1890), 76 Wis. 313, 45 N. W. 104, and the test of necessity stated with respect to easements other than rights of way in *Bullis v. Schmidt, supra,* page 462.

6. *Order denying motion to vacate judgment, and for a new trial.* Plaintiffs appealed only from the judgment. Their brief asserts that the order denying the motion to vacate the judgment was erroneous. Defendants do not object to our reviewing this order, but argue that it was correct. The order and motion papers are included in the record.

It is clear that an order after judgment denying a motion to vacate the judgment and for a new trial is appealable, but that an appeal from the judgment does not bring it here for review. *McMahon v. Snyder* (1903), 117 Wis. 463, 467, 94 N. W. 351; *Harvey v. Harvey* (1930), 201 Wis. 378, 380, 230 N. W. 79. It would follow that this order is not properly before us.

We have noted, however, the enactment of ch. 189, Laws of 1959, creating sec. 274.11 (4), Stats., and providing:

"The right of appeal shall exist from the time of the entry of the appealable order or judgment and in cases of appeal the supreme court shall have jurisdiction over the subject matter of the action from that time. The procedural requirements of subs. (1), (2), and (3) and of this chapter shall relate only to the jurisdiction of the court over the parties to the appeal."

We have not had the benefit of brief or argument as to whether this statute authorizes us to review an appealable order as to which no notice of appeal has been served if the parties appear before us and argue the merits without noting any objection to our jurisdiction. If that be the effect of the statute, we would affirm the order.

Plaintiffs' motion was supported by Mr. Sicchio's affidavit that he had discovered that five witnesses would testify to the adverse use of the driveway for more than twenty years, and by the affidavits of the proposed witnesses. The court denied the motion because it deemed the testimony outlined in the affidavits insufficient to establish a private or public right of way by user, and because plaintiffs had not shown diligence.

The circuit court did not abuse its discretion. Plaintiffs and the proposed witnesses have been residents of the small community of Mercer for many years. One of the proposed witnesses was Stanley Kountney who testified extensively at the trial, and there is no explanation of why his testimony upon further trial would be different. The action was commenced October 27, 1956, and tried piecemeal over a long period, on July 15, 1957, September 18, 1957, and April 30, 1959. There can be little reason for plaintiffs' not discovering and subpoenaing the four additional witnesses before the last day of trial if they could add anything.

*By the Court.*—Judgment affirmed.